IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| HOWARD GOLDFINGER, Individually And On Behalf Of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>JOURNAL COMMUNICATIONS INC., STEVEN J. SMITH, DEAN H. BLYTHE, DAVID J. DRURY, JONATHAN NEWCOMB, MARY ELLEN STANEK, OWEN J. SULLIVAN, JEANETTE TULLY, THE E.W. SCRIPPS COMPANY, SCRIPPS MEDIA, INC., DESK SPINCO, INC., SCRIPPS NP OPERATING LLC, DESK NP MERGER CO., DESK BC MERGER LLC, BOAT SPINCO, INC., BOAT NP MERGER CO., and JOURNAL MEDIA GROUP,<br><br>     Defendants. | Case No.<br><br>DEMAND FOR JURY TRIAL<br><br>**COMPLAINT – CLASS ACTION** |

**COMPLAINT FOR VIOLATIONS OF §§ 14(a) AND 20(a)**
**OF THE SECURITIES ACT OF 1934 AND**
**BREACH OF COMMON LAW FIDUCIARY DUTIES**

   Plaintiff Howard Goldfinger ("Plaintiff"), by his attorneys, alleges upon information and

belief, except for those allegations that pertain to Plaintiff, which are alleged upon personal

knowledge, as follows:

**NATURE OF THE ACTION**

   1.  This is an stockholder action on behalf of the holders of the common

stock of Journal Communications, Inc. ("Journal" or the "Company"), other than Defendants

(defined below) and their affiliates, against Journal and the Company's board of directors (the

"Board" or the "Individual Defendants"), in connection with The E.W. Scripps Company's (referred to herein as "E.W. Scripps" or "Scripps") proposed merger with Journal (the "Proposed Transaction"), arising out of the Individual Defendants' and E.W. Scripps' violations of §§ 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder in connection with the dissemination of a false and materially misleading recommendation statement filed on or about November 20, 2014, and amended on or about December 23, 2014 (collectively, the "Recommendation Statement") (both of which Statements were filed with the SEC and directed to Journal and Scripps stockholders by registrant E.W. Scripps) in connection with the Proposed Transaction. Plaintiff also brings this action against the Individual Defendants for violation of their common law fiduciary duties in connection with the failure to disclose material information to Journal's public stockholders in connection with the issuance of the Recommendation Statement. Plaintiff also brings this class action on behalf of stockholders of Journal against Scripps Media Inc., Desk Spinco Inc., Scripps NP Operating, LLC, Desk BC Merger LLC, Boat Spinco Inc., Journal Media Group, Desk NP Merger Co, Boat NP Merger Co., and E.W. Scripps for aiding and abetting the Individual Defendants' breaches of their common law fiduciary duties, in connection with the Proposed Transaction.

2.      On July 30, 2014, Journal and E.W. Scripps announced a definitive Agreement and Plan of Merger (the "Merger Agreement") pursuant to which E.W. Scripps and Journal have agreed to merge their broadcast operations and spin off and then merge their newspapers, creating two separately traded public companies. Journal Class A and Class B stockholders will receive 0.5176 E.W. Scripps Class A common shares and 0.1950 shares in new resulting newspaper company, Journal Media Group ("JMG"), for each Journal share. E.W. Scripps

shareholders will reportedly receive 0.2500 shares in for each Class A common share and each common voting share they hold in E.W. Scripps. Journal shareholders will own approximately 31% of E.W. Scripps' total shares following the merger, and E.W. Scripps shareholders will retain approximately 69% ownership. The E.W. Scripps family will retain its controlling interest in E.W. Scripps through its ownership of common voting shares. E.W Scripps shareholders will own 59% of the new JMG, and Journal shareholders will own 41%. JMG will have one class of stock and no controlling shareholder.

3.      The Board has abdicated its responsibilities to Journal's public shareholders by not performing a detailed, full, and transparent process and by including misstatements in the Recommendation Statement and/or omitting material information from the Recommendation Statement that renders other information contained therein materially misleading. As a consequence, shareholders have not been provided material information, which has rendered materially misleading other statements in the Recommendation Statement. Shareholders therefore have not been provided material information with which they need in order to ascertain whether or not to vote their shares for the Proposed Transaction.

4.      The Recommendation Statement misstates and/or omits material information concerning the process leading up to the Proposed Transaction, the reasons for pursuing it, and the fairness to Journal shareholders in order to persuade shareholders vote in favor of the Proposed Transaction. Among other things, the Recommendation Statement either misstates or omits material information concerning the following categories/issues: (1) conflicts of interest and material information concerning the flawed and unfair process leading to the predetermined sale of Journal to Scripps; (2) information necessary to render complete, fair and accurate the fairness opinions and analyses related thereto issued by the parties' financial advisors (Wells

3

Fargo Securities, LLC ("Wells Fargo") and Methuselah Advisors, LLC ("Methuselah")), respectively, in connection with the Proposed Transaction and (3) certain projections withheld from shareholders and their impact on the fairness of the Proposed Transaction to Journal's shareholders.

5.      Additionally, Methuselah is irreparably conflicted as a financial advisor, as evidenced by, *inter alia*, Methuselah founders John Chachas' long-standing relationship with Scripps and the "finder's fee" that Methuselah will apparently receive (in addition to a financial advisory fee).

6.      In order to make a fully, fairly and sufficiently informed decision on whether to vote for the Proposed Transaction, Journal's public shareholders are entitled to full and fair disclosure of all material information within the purview of Defendants.

7.      For these reasons and as set forth in detail *infra*, Plaintiff seeks to enjoin or to rescind the Proposed Transaction in the event of its consummation if all material information regarding the Proposed Transaction is not provided to Journal's public shareholders prior to the vote on the proposed merger.

## JURISDICTION

This Court has jurisdiction over all claims asserted herein pursuant to § 27 of the 1934 Act for violations of §§ 14(a) and 20(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1332(a)(1) and

4

(2) in that Plaintiffs and Defendants are citizens of different states or subjects of a foreign state and the matter in controversy exceeds $75,000, exclusive of interest and costs.

8.      Venue is proper in this district pursuant to 28 U.S.C. §1391 because Journal has its principal place of business in this district. Plaintiff's claims arose in this district, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court. Moreover, each of the Individual Defendants, defined below, as Company officers and/or directors, has extensive contacts with this district.

## THE PARTIES

9.      Plaintiff is and has been a stockholder of Journal at all times relevant hereto.

10.     Journal is a Wisconsin corporation with its principal executive offices located at 333 W. State Street, Milwaukee, Wisconsin.  The Company operates as a media company in the United States, and its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "JRN."

11.     Defendant Steven J. Smith ("Smith") is Chairman of the Board and Chief Executive Officer of the Company.  Smith will become non-executive chairman of the post-merger JMG entity.

12.     Defendant Dean H. Blythe ("Blythe") is a director of the Company.

13.     Defendant David J. Drury ("Drury") is a director of the Company.

14.     Defendant Jonathan Newcomb ("Newcomb") is a director of the Company.

15.     Defendant Mary Ellen Stanek ("Stanek") is a director of the Company.

16.     Defendant Own J. Sullivan ("Sullivan") is a director of the Company.

17.     Defendant Jeanette Tully ("Tully") is a director of the Company.

18.     Defendants Smith, Blythe, Drury, Newcomb, Stanek, Sullivan, and Tully may be collectively referred to hereinafter as the "Individual Defendants."

19.     Scripps, headquartered in Cincinnati, Ohio, serves audiences and businesses through a portfolio of television, print and digital media brands. Scripps owns 21 local television stations as well as daily newspapers in 13 markets across the United States. It also runs an expanding collection of local and national digital journalism and information businesses. Following completion of the transactions, Scripps will own and operate television and radio stations serving twenty-seven markets and reaching 18% of U.S. television households, making it the fifth largest independent television group in the country.  Scripps class A common shares are traded on the NYSE under the trading symbol "SSP." Scripps' principal executive office is located at 312 Walnut Street, 28th Floor, Cincinnati, Ohio 45202.

20.     Scripps Media, Inc. is a Delaware corporation and a direct, wholly owned subsidiary of Scripps. Scripps Media, Inc. owns and operates Scripps' broadcast television stations and all but two of Scripps' newspapers. The newspapers that are not operated by Scripps Media, Inc. are owned by subsidiaries that are majority owned by Scripps. Following the completion of the transactions, Scripps Media, Inc. will continue to be a direct, wholly owned subsidiary of Scripps and will continue to own the broadcast television stations that it currently owns. Scripps Media Inc.'s office is located at 312 Walnut Street, 28th Floor, Cincinnati, Ohio 45202.

21.     Desk Spinco, Inc. is a Wisconsin corporation and a direct, wholly owned subsidiary of Scripps Media Inc. Desk Spinco, Inc. has been formed solely to effect the spin-off of the newspaper business of Scripps and facilitate the subsequent combination of the newspaper businesses of Scripps and Journal. Desk Spinco, Inc. has not carried out any activities to date,

except for activities incidental to its formation or the transactions contemplated by the master agreement. Following completion of the transactions, Desk Spinco, Inc. will be a direct, wholly owned subsidiary of Journal Media Group owning and operating what is now the Scripps newspaper business. Desk Spinco, Inc.'s office is located at 312 Walnut Street, 28th Floor, Cincinnati, Ohio 45202.

22.     Scripps NP Operating, LLC, a Wisconsin limited liability company (formerly known as Desk NP Operating, LLC), is a wholly owned subsidiary of Scripps Media Inc. Scripps NP Operating, LLC was formed solely to facilitate the spin-off of the Scripps newspaper business. Following the completion of the transactions, Scripps NP Operating, LLC will continue to be a direct, wholly owned subsidiary of Desks Spinco, Inc. Scripps NP Operating, LLC has not carried out any activities to date, except for activities incidental to its formation or the transactions contemplated by the master agreement. Scripps NP Operating, LLC's office is located at 312 Walnut Street, 28th Floor, Cincinnati, Ohio 45202.

23.     Desk NP Merger Co. is a Wisconsin corporation and wholly owned subsidiary of JMG. Desk NP Merger Co. was formed solely to effect the combination of the Scripps and Journal newspaper businesses. Desk NP Merger Co. has not carried out any activities to date, except for activities incidental to its formation or the transactions contemplated by the master agreement. Following completion of the transactions, Desk NP Merger Co. will cease to exist. Desk NP Merger Co.'s office is located at 312 Walnut Street, 28th Floor, Cincinnati, Ohio 45202.

24.     Desk BC Merger, LLC is a Wisconsin limited liability company and wholly owned subsidiary of Scripps. Desk BC Merger, LLC was formed solely to effect the combination of the broadcast businesses of Scripps and Journal through the merger of Journal into Desk BC

Merger, LLC following the spin-offs and combination of the newspaper businesses of Scripps and Journal. Desk BC Merger, LLC has not carried out any activities to date, except activities incidental to its formation or the transactions contemplated by the master agreement. Following completion of the transactions, Desk BC Merger, LLC will be a direct, wholly owned subsidiary of Scripps owning and operating what is now the Journal broadcast business. Desk BC Merger, LLC's office is located at 312 Walnut Street, 28th Floor, Cincinnati, Ohio 45202.

25.     Boat Spinco, Inc. is a Wisconsin corporation that is a direct, wholly owned subsidiary of Journal. Boat Spinco, Inc. has been formed to effect the spin-off of Journal's newspaper business and facilitate the subsequent combination of the Scripps and Journal newspaper businesses. Boat Spinco, Inc. has not carried out any activities to date, except for activities incidental to its formation or the transactions contemplated by the master agreement. Following completion of the transactions, Boat Spinco, Inc. will be a direct, wholly owned subsidiary of JMG and will operate what is now the Journal newspaper business. Boat Spinco, Inc.'s office is located at 333 West State Street, Milwaukee, Wisconsin 53203.

26.     Boat NP Merger Co. is a Wisconsin corporation and wholly owned subsidiary of JMG. Boat NP Merger Co. was formed solely to effect the combination of the Scripps and Journal newspaper businesses. Boat NP Merger Co. has not carried out any activities to date, except for activities incidental to its formation or the transactions contemplated by the master agreement. Following completion of the transactions, Boat NP Merger Co. will cease to exist. Boat NP Merger Co.'s office is located at 333 West State Street, Milwaukee, Wisconsin 53203.

27.     Journal Media Group or JMG, incorporated originally as Boat NP Newco, Inc., is a Wisconsin corporation currently owned equally by Scripps and Journal. JMG has not carried out any activities to date, except for activities incidental to its formation or the transactions

contemplated by the master agreement. Following completion of the transactions, JMG will be the parent company of Desk Spinco, Inc., which will operate what is now the Scripps newspaper business, and Boat Spinco, Inc., which will operate what is now the Journal newspaper business. Scripps shareholders will hold 59%, and Journal shareholders 41%, of the outstanding capital stock of JMG at the completion of the transactions. The common stock of JMG is expected to be listed for trading on the NYSE under the symbol "JMG." JMG's office is located at 333 West State Street, Milwaukee, Wisconsin 53203.

28.     The Individual Defendants along with Journal, Scripps, Scripps Media, Inc., Desk Spinco, Inc., Scripps NP Operating LLC, Desk NP Merger Co., Desk BC Merger LLC, Boat Spinco, Inc., Boat NP Merger Co., and JMG may be collectively referred to herein as "Defendants."

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of all stockholders of the Company (except Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants) and their successors in interest, who are or will be threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

30.     This action is properly maintainable as a class action because:

(a)     The Class is so numerous that joinder of all members is impracticable. As of September 30, 2014, there were reportedly 44,692,345 of the registrant's Class A Common shares, $.01 par value per share, outstanding and 11,932,722 of the registrant's Common Voting shares, $.01 par value per share, outstanding, owned by hundreds, if not thousands, of stockholders.

9

(b)     There are questions of law and fact which are common to the Class and which predominate over any questions affecting only individual members, including, *inter alia*, the following:  (i) whether the Individual Defendants agreed to the Proposed Transaction at grossly inadequate consideration and value for the Company's public shareholders; (ii) whether Defendants failed to make a meaningful effort to ascertain the true and accurate transactional value of the Company; (iii) whether the Proposed Transaction suffers from substantial conflicts of interest which provides substantial benefits to insiders or others to the detriment of Journal stockholders; (iv) whether the Recommendation Statement contains false and misleading statements and omissions; (v) whether the Defendants have violated §§ 14(a) and 20(a) of the 1934 Act and any other applicable laws, rules or regulations by disseminating a false and misleading Recommendation Statement; and (vi) whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by Defendants.

(c)     Plaintiff is committed to prosecuting this action and has retained counsel competent and experienced in litigation of this nature.  The claims of Plaintiff are typical of the claims of other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Plaintiff will fairly and adequately represent the Class.

(d)     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

(e)     Defendants have acted in a manner which affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

(f)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members

10

of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other Class members or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

### A. Background and Events leading Up to the Proposed Transaction

31.     Journal is a diversified media and communications company. The Company has operations in publishing, radio and television broadcasting, telecommunications, and printing services. According to its website, Journal owns and operates or provides services to 14 television stations and 35 radio stations in 11 states, Journal publishes the *Milwaukee Journal Sentinel*, which serves as the only major daily newspaper for the metro-Milwaukee area, and several community newspapers in Wisconsin, and "[i]n support of its strong local broadcasting and publishing brands, Journal operates a growing portfolio of digital media assets, from websites to apps to mobile products, that allow viewers, listeners and readers to access Journal's original content anytime and from any device." According to the Company's website, through "compelling content, we serve local television, radio and online audiences across the country with news and entertainment. Led by the award-winning Milwaukee Journal Sentinel, we've built a storied newspaper into a combined print and digital business geared toward the future."

### The Company's Impressive and Improving Financial Performance

32.     On March 4, 2014, Journal reported its fourth quarter and full year 2013 financial results. Despite the fourth quarter of 2013 and full year 2013 being one week shorter than the prior year, and it not being a political year, the Company still delivered solid financial results. In the fourth quarter of 2013, revenue of $107.4 million decreased 12.1%, though revenue actually *increased* 11% excluding the political advertising factor and the extra week, as compared to the

same period a year ago.  For the full year 2013, revenue of $397.3 million increased 1.1%, and increased 2.6% (again excluding the extra week in 2012) as compared to same period in 2012.

33.     On April 29, 2014, the Company announced results for its first quarter 2014 ended March 30, 2014.  For the first quarter, revenue of $96.6 million increased 3.7% over the same period in 2013.  Net earnings for the quarter were $12.2 million compared to $3.8 million for the same period a year ago.  Net earnings per share of class A and B common stock from continuing operations were $0.12 compared to $0.08 in the same period in 2013.

34.     On April 29, 2014, the Company announced that for its second quarter of 2014 the Company expects total television revenue (excluding political advertising revenue) to be up in the low to mid-teens as compared to the second quarter of 2013.  In radio (again excluding political revenue) the Company expects revenue increases in the low-single digits as compared to the second quarter of 2013.  In publishing, the Company anticipates revenue to be comparable to the second quarter of 2013.  The Company stated that it expected to announce its second quarter 2014 results on August 7, 2014.

35.     However, prior to announcing its continued improving financial results for the second quarter of 2014, the Company and the Defendants announced that they were preempting the public shareholders' opportunities to participate in the Company's future growth and business prospects and profits by announcing (on July 30, 2014) that they were merging Journal's operations with E.W. Scripps for inadequate and unfair consideration, pursuant to the terms of the Proposed Transaction.

36.     As forecasted, in announcing its second quarter of 2014 results on August 7, 2014, Journal reported revenues of $104.7 million, up 4.9% from a year ago, and digital revenue of $5.4 million, a growth of 10.0%, and operating earnings of $17.4 million, a 34.4% increase.

On the Journal's second quarter 2014 (also on August 7, 2014), Defendant Smith commented: "Today, we're here to focus on [Journal's] performance in the second quarter. And once again, we had a solid quarter, driven by continued growth in retransmission and political revenue at our Television stations and overall increased revenue in Radio. Total revenue was $105 million, up 5% year-over-year, which drove an operating earnings increase of 34% in the quarter."

37.     Journal's financial prospects have only continued to improve.  On October 30, 2014, in announcing the Company's third quarter of 2014 results, Defendant Smith remarked: "we are pleased to report solid earnings growth in the third quarter. Journal Communications' total revenue was $105 million, up 8.5% year-over-year with growth in our Broadcast business offsetting declines in our Publishing business. Operating earnings were $14 million, up 40%."

38.     Journal has been and is a financially thriving company, in spite of its being undervalued by the Proposed Transaction.  The Proposed Transaction, if it closes, undervalues the Company and will cut off the stockholders from receiving proper compensation.  Despite having initially lagged in releasing the Recommendation Statement, Defendants appear to be suddenly moving quickly to consummate the Proposed Transaction.  Consequently, immediate judicial intervention is warranted to prevent and/or rectify existing and future irreparable harm to the Company's shareholders.  Plaintiffs seek to enjoin the Proposed Transaction.

**B.     The Board Agrees to the Proposed Transaction**

39.     On July 30, 2014, E.W. Scripps and Journal announced the Proposed Transaction, pursuant to which they had agreed to merge their broadcast operations, and spin off and then merge their newspaper assets, creating two separately traded public companies.

40.     The merged broadcast and digital media company will be based in Cincinnati, Ohio, will retain the E.W. Scripps name, and the E.W. Scripps family shareholders will continue

to have voting control. The new resulting newspaper company, JMG, will combine E.W. Scripps' daily newspapers, community publications and related digital products in 13 markets with Journal's Milwaukee Journal Sentinel, Wisconsin community publications and affiliated digital products.

41.     Journal's Class A and B shareholders will reportedly receive 0.5176 E.W. Scripps Class A common shares and 0.1950 shares in JMG for each Journal share they own. E.W. Scripps shareholders will receive 0.2500 shares in JMG for each Class A common share and each common voting share they hold in E.W. Scripps. Existing Journal shareholders will own approximately 31% of E.W. Scripps' total shares following the merger, and E.W. Scripps shareholders will retain approximately 69% ownership. The E.W. Scripps family will retain its controlling interest in the post-deal E.W. Scripps entity through its ownership of common voting shares. Post-transaction, current E.W. Scripps shareholders will own 59% of the new newspaper company, JMG, and Journal shareholders will own 41%. JMG will have one class of stock and no controlling shareholders. Defendant Smith will become non-executive chairman of the board of JMG. The transaction is expected to close in 2015.

42.     In addition, E.W. Scripps shareholders will receive a $60 million special cash dividend as part of the Proposed Transaction (equaling about $1 per share).

### C.     Methuselah, Journal's Financial Advisor, is Materially and Irreconcilably Conflicted

43.     In connection with the Proposed Transaction, Journal hired as its sole investment banking firm/financial advisor a little-known financial advisory firm, Methuselah.[1] Methuselah

---

[1] By contrast, Scripps and the Scripps family retained two very well-known and established financial advisory firms -- Wells Fargo and Evercore Partners -- as their respective financial consultants in connection with the Proposed Transaction.

was, and is, the only financial advisor retained by Journal to advise it in connection with the Scripps deal. Methuselah was also retained by the Board to issue a "fairness opinion" on the Proposed Transaction vis-à-vis Journal's shareholders. However, Methuselah is materially and irreconcilably conflicted and unfit to serve as Journal's financial advisor in connection with the Proposed Transaction.

44. Methuselah is a relatively new (created in late 2010 or early 2011), quite small (only 10-20 employees, apparently including support staff) and little-known financial advisory firm. In fact, Methuselah has never been ranked among the top twenty financial advisory firms (based upon either deal volume or deal value) with respect to work done on U.S. (much less global) merger transactions.[2] The Merger Agreement calls for the retention of a "financial advisor of nationally recognized reputation," and specifically requires the opinion of such an advisor in order for the Board to be able to exercise its "fiduciary out" under the Merger Agreement (§ 10.02).[3] The Board's retention of and reliance on Methuselah is, among other things, indicative that the Board did not and does not take the "fiduciary out" provision of the Merger Agreement seriously, and has little or no true intention of even complying with its terms should it become applicable.

45. Making matters worse, Methuselah cannot be considered an "independent" financial advisor. Methuselah's principal, John Chachas, is a former Lazard Ltd. banker with apparent longstanding and close ties to Scripps. While employed at Lazard, Mr. Chachas was "a

---

[2] Indeed, Methuselah's sole listed transaction in all of 2012 was a deal on which it also advised Journal involving the purchase of WFTV NewsChannel 5 (a CBS-affiliated television station in Tennessee) from Landmark Media Enterprises, LLC.

[3] In contrast, both Wells Fargo Securities and Evercore Partners rank among the top financial advisory firms in terms of both volume and value.

*senior calling officer responsible for [Lazard's] relationships with The E.W. Scripps Company*."[4]  Mr. Chachas' longstanding ties to Scripps obviously benefitted him financially as well as politically; at least one former member of Scripps' board (Jeff Sagansky, currently a director of Scripps' subsidiary, Scripps Networks Interactive, Inc.) was a direct contributor to Chachas' unsuccessful campaign for one of Nevada's U.S. seats in 2010.

46.    Also, it appears that Methuselah/Chachas, in addition to being retained as Journal's financial advisor, was also the "broker" on the Proposed Transaction.  Indeed, media reports indicate that Mr. Chachas appears to have originated the transaction himself and then took it, ultimately signed, sealed and delivered, to Scripps.  According to an August 11, 2014 article appearing in *Broadcast & Cable*, titled "The Go-For Brokers": "Last month, Scripps and Journal Communications uncorked a one-two punch, declaring they would merge and then spin-off into separate companies . . . . ***John Chachas is the man who fostered the deal, which will result in a fortified Scripps generating a projected $800 million in annual revenue***").[5]  For brokering the deal, it appears that Methuselah will get a brokerage fee or a "finder's fee" (plus expenses) in addition to a financial advisory fee (*see* Merger Agreement §§ 8.13 and 8.27[6]); it is

---

[4] http://www.tvonwallstreet.com/speakers.  (All emphases herein are added unless otherwise indicated).  *See also http://nab.org/documents/events/speakers/futuresSummit/johnChachas.asp* (stating that while at Lazard, Chachas was "responsible for Lazard's relationships with numerous large media concerns ***including The E.W. Scripps Company and Scripps Networks***, . . ." ).
[5] http://www.mediaventurepartners.com/article/go-for-brokers-article-from-broadcasting-cable--2.  *See also id.* (Describing Mr. Chachas a  behind-the-scenes "broker" who "makes sure the client stays on its Wall Street-pleasing acquisitive streak, the family gets the best possible return on its long-held batch of stations, or the merger makes both parties happy.").

[6] Section 8.13:  "***Finders' Fees. Except for [Methuselah]*** (all of whose fees and expenses shall be paid by Journal), there is no investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of Journal or any of its Affiliates that might be entitled to any fee or commission from Journal or any of its Affiliates in connection with the Transactions."  (Emphasis in original).

at the very least unclear from the disclosures in the Recommendation Statement whether or not Methuselah is entitled to such an additional fee/expense payment for brokering the deal, not to mention the amount of such an additional brokerage or finders fee/expense payment..

47.    At a minimum, Chachas/Methuselah's longstanding and deep ties to Scripps, as well as Methuselah's dual status as both the broker of Proposed Transaction and Journal's financial advisor,[7] create material (indeed insurmountable) conflicts of interest which should disqualify (indeed, should already have disqualified) it to serve as Journal's financial advisor and render it unfit to issue any sort of "fairness opinion" on the proposed deal.  In turn, the Board has obviously acted knowingly and/or willfully in relying upon such a clearly conflicted and inadequate financial advisor.

48.    Moreover, none of these facts or circumstances surrounding Methuselah, the Company's sole financial advisor, and its conflicted status, are adequately (if at all) disclosed in the Recommendation Statement.  The Defendants were and/or are fully aware (or at the very least intentionally or and/or recklessly ignorant) of these material facts and circumstances, but have inexplicably chosen to conceal them from Journal's public stockholders by failing to disclose them in the Recommendation Statement.

---

Section 8.27: "*Opinion of Financial Advisor*. The Board of Directors of Journal has received the opinion of Methuselah to the effect that, as of the date of such opinion and based upon and subject to the assumptions, qualifications and limitations set forth therein, the Journal Newspaper Exchange Ratio and the Broadcast Exchange Ratio provided for in the Mergers, viewed as a single integrated transaction, are fair, from a financial point of view, to the holders of Journal Common Stock collectively as a group."

[7] Plaintiff expects to be able to offer additional material information in his ultimate amended complaint based on his and his counsel's continued investigation and ongoing review and analysis of the Proposed Transaction and the surrounding circumstances.

**D.      Material Misstatements and Omissions in the Recommendation Statement**

49.      In order to persuade shareholders to vote in favor of the Proposed Transaction, Defendants have issued a Recommendation Statement (the "Recommendation Statement"), filed on November 20, 2014 with the SEC, which misstates and/or omits certain material information concerning the process leading up to the Proposed Transaction, the reasons for pursuing it and the fairness to Journal shareholders.

50.      Among other things, the Recommendation Statement either misstates or omits material information concerning the following categories/issues: (1) conflicts of interest and material information concerning the flawed and unfair process leading to the predetermined sale of Journal to Scripps; (2) information necessary to render complete, fair and accurate the fairness opinions and analyses related thereto issued by the parties' financial advisors (Wells Fargo Securities and Methuselah, respectively), in connection with the Proposed Transaction and (3) certain projections withheld from shareholders and their impact on the fairness of the Proposed Transaction to Journal's shareholders.  In order to make a fully, fairly and sufficiently informed decision on whether to vote for the Proposed Transaction, Journal's public shareholders are entitled to full and fair disclosure of all material information within the purview of Defendants. The current Recommendation Statement falls far short of this critical goal.

**(i)      Misstatements or Omissions as to the Background of the Transaction**

51.      The Recommendation Statement's discussion of the events leading up to the Proposed Transaction, as well as the conflicts of interests inherent in the sales process, is materially incomplete and fails to provide shareholders with a comprehensive picture of the progression of the deal.  For example, the Recommendation Statement fails to disclose key information on the following topics/issues:

18

- The numerous conflicts of interest and issues surrounding Methuselah, Journal's sole financial advisor;

- Whether the description of "advisors" who, "beginning in mid-2012, (worked) to identify, review and evaluate various strategic opportunities" (Dec. 23, 2014 Recommendation Statement at 63) included Methuselah, and if not, why was Methuselah retained, and not the other advisors;

- The details of the "historic relationship" between Journal and Methuselah;

- Whether there were discussions between Journal and Scripps prior to December 2013; and

- What role, if any, Methuselah played in facilitating discussions between Journal and Scripps;

- Discussion of the details of negotiations relating to the sharing ratio; and

- Whether there was any discussion of including a provision for any kind of market check, or whether any market check has already taken place.

52.     This information concerning the background of the Proposed Transaction is vitally important to ensure that shareholders are provided with full disclosure of all of the facts leading up to the Proposed Transaction with Scripps in order to determine whether that process was fair and resulted in a transaction that was in the best interests of Journal's public shareholders.

53.     Moreover, information which would otherwise render the fairness opinions complete is omitted, leaving shareholders with no reasonable manner of objectively determining the financial merits of the Proposed Transaction. This information is essential in allowing

shareholders to make a fully informed decision on whether to vote in favor of the Proposed Transaction.

(ii)     **Methuselah's Flawed Fairness Opinion**

54.     The Recommendation Statement fails to provide adequate information concerning the financial analysis performed by Journal's financial advisor, Methuselah. Specifically with regard to the *Broadcast Merger*, the Recommendation Statement:

- As to *Discounted Cash Flow Analysis*, fails to define and/or provide the formula for unlevered free cash flow;

- As to *Discounted Cash Flow Analysis*, fails to explain how Methuselah accounted for the value of cash flows during the second half of 2014, given that the date of Methuselah's opinion was July 30, 2014;

- As to *Discounted Cash Flow Analysis*, fails to justify the use of lower discount rates for Scripps than for Journal and also fails to identify, quantify and source the WACC assumptions used for both;

- As to *Discounted Cash Flow Analysis*, fails to justify the use of lower terminal multiples for Journal than for Scripps;

- As to *Discounted Cash Flow Analysis*, fails to disclose the implied growth rates corresponding to the assumed terminal multiples;

- As to *Selected Public Companies Analyses*, fails to disclose the objective selection criteria along with the observed company-by-company pricing multiples and financials metrics examined by Methuselah and also fails to discuss whether other multiples were examined, and if so, to disclose them;

- As to *Selected Public Companies Analyses*, fails to indicate the source of the estimated EBITDA figures for the public companies;

- As to *Selected Public Companies Analyses*, fails to justify the apparent pessimistic bias towards multiples selected for Journal (Methuselah's selected range for Journal extends below the lower end of the observed range for the selected TV companies) compared to the apparent optimistic bias towards multiples selected for Scripps (Methuselah's selected range for Scripps extends above the upper end of the observed range for the selected TV companies);

- As to *Selected Precedent Transactions Analyses*, fails to disclose objective selection criteria and display the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics and also fails to discuss whether other multiples and/or transaction premiums examined, and if so, to disclose them;

- As to *Selected Precedent Transactions Analyses*, espouses a nonsensical explanation in that there is no valid reason to divide transaction values for the transaction target companies by their respective "blended calendar years 2014 and 2015 estimated EBITDA." The relevancy of doing so is unclear (if it could even be done) for the Four Points Media transaction announced in 2011. The other multiple described (i.e., "multiple of then-current and then-most recent prior calendar year estimated EBITDA") is feasible, but it would indicate that the pertinent years for Journal and Scripps are 2014 (current) and 2013 (most recent), not 2015;

- As to *Selected Precedent Transactions Analyses*, espouses a nonsensical explanation in that there is no valid reason to divide transaction values for the transaction target companies by their respective "calendar year 2014 estimated EBITDA." Again, the relevancy of doing so is unclear (if it could even be done) for the Citadel Broadcasting transaction announced in 2010.

- As to *Selected Precedent Transactions Analyses*, fails to justify the selection of a lower range of multiples for Journal's television business than for Scripps' broadcast business.

55. As to the *Newspaper Mergers*, the Recommendation Statement:

- As to *Discounted Cash Flow Analyses*, fails to justify the use of higher terminal multiples for SNI than for JRN;

- As to *Discounted Cash Flow Analyses*, fails to disclose the implied growth rates corresponding to the assumed terminal multiples;

- As to *Discounted Cash Flow Analyses*, fails to justify the use of lower discount rates for Scripps than for Journal and fails to identify, quantify and source the WACC assumptions used for both;

- As to *Selected Public Companies Analyses*, fails to disclose the objective selection criteria along with the observed company-by-company pricing multiples and financials metrics examined by Methuselah and also fails to discuss whether other multiples were examined, and if so, to disclose them;

- As to *Selected Public Companies Analyses*, fails to justify the apparent pessimistic bias towards multiples selected for Journal's newspaper business, as Methuselah's selected range for Journal lies entirely below the median of the

observed range for the selected newspaper companies, as well as a full turn below the range Methuselah selected for Scripps's newspaper business;

- As to *Selected Precedent Transactions Analyses*, fails to disclose objective selection criteria and display the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics and also fails to discuss whether other multiples and/or transaction premiums were examined, and if so, to disclose them;

- As to *Selected Precedent Transactions Analyses*, fails to justify the apparent pessimistic bias towards multiples selected for Journal's newspaper business, as the range Methuselah selected for Journal's newspaper business is a half-turn below the range Methuselah selected for Scripps's newspaper business; and

- As to *Miscellaneous*, fails to quantify the fees paid to Methuselah by Journal for the services detailed on this page and also fails to indicate services/fees with respect to Scripps as well.

**(iii)   Flawed Management Projections**

56.   The Recommendation Statement fails to disclose material aspects of financial projections for both Journal and Scripps. The tables throughout the section entitled *Certain Unaudited Prospective Financial Information Utilized by Scripps and Journal* fail to include a consideration of valuable metrics such as unlevered free cash flows, stock-based compensation, Reconciliation of GAAP net income to non-GAAP UFCF and non-GAAP EBITDA, EPS, CapEx, Synergies, including the costs required to realize such synergies, as well as all figures for the stub period consisting of the second half of 2014.  Without the omitted information, Journal's

public stockholders do not have sufficient information to evaluate the future prospects of the Company. Additionally, the Recommendation Statement:

- As to *Journal Broadcast Business Management Forecasts*, table note 1, fails to clearly explain that pension obligations are associated with both divisions, and not just broadcast. This, however, is not clear based on the description of Wells Fargo's analysis, in which pension liabilities/costs are only discussed in the context of the broadcast business; and

- As to *Journal Broadcast Business Management Forecasts*, table note 2, fails to disclose why management/governance costs were excluded, nor does it discuss how such costs were handled by the financial advisors.

**(iv)    Wells Fargo's Flawed Fairness Opinion**

57.    The Recommendation Statement fails to provide adequate information concerning the financial analysis performed by Scripps's financial advisor, Wells Fargo, both as it pertains to Scripps' and Journal's broadcast businesses and the newspaper businesses. With regard to the *Financial Analyses of the Scripps Broadcast Business*, the Recommendation Statement:

- As to *Selected Public Traded Companies Analysis*, fails to disclose the objective selection criteria along with the observed company-by-company pricing multiples and financials metrics examined by Wells Fargo and whether Wells Fargo examined other multiples, and if so, to disclose them;

- As to *Selected Public Traded Companies Analysis*, fails to explain the fully diluted shares outstanding, given that the indicated value is for a segment and not the entire company;

- As to *Selected Public Traded Companies Analysis*, espouses a potentially significant analytical error when it applied enterprise value ("EV") multiples to both EBITDA and EBITDAP. While this is not a problem for EBITDA, it is a problem for EBITDAP. Wells Fargo calculated pricing multiples with EV in the numerator and EBITDA in the denominator, and adjusted EV in the numerator and EBITDAP in the denominator. Adjusted EV includes pension related liabilities, and EBITDAP includes pension-related costs;

- As to *Discounted Cash Flow Analysis*, fails to define and/or provide the formula for unlevered free cash flow;

- As to *Discounted Cash Flow Analysis*, fails to identify, quantify and source the WACC assumptions;

- As to *Discounted Cash Flow Analysis*, fails to disclose the implied growth rates corresponding to the assumed terminal multiples;

- As to *Discounted Cash Flow Analysis*, Wells Fargo made a potentially significant analytical error when it deducted pension liabilities from EV, rather than from adjusted EV; and

- As to *Discounted Cash Flow Analysis*, fails to explain the fully diluted shares outstanding, given that the indicated value is for a segment and not the entire company.

58. With regard to the *Financial Analyses of the Journal Broadcast Business*, the Recommendation Statement:

- As to *Selected Public Traded Companies Analysis*, fails to disclose the objective selection criteria along with the observed company-by-company pricing multiples

and financials metrics examined by Wells Fargo and also fails to discuss whether other multiples were examined, and if so, to disclose them;

- As to *Selected Public Traded Companies Analysis*, Wells Fargo made a potentially significant analytical error when it applied EV multiples to both EBITDA and EBITDAP;

- As to *Selected Public Traded Companies Analysis*, fails to explain why both EBITDA and EBITDAP multiples were used for TV companies, whereas only EBITDA multiples were used for radio companies;

- As to *Selected Public Traded Companies Analysis*, fails to explain why Wells Fargo failed to do a sum-of-the-parts analysis for the TV and radio segments as this is one of the reasons company-by-company pricing multiples and financial metrics are important to shareholders;

- As to *Selected Transactions*, fails to disclose objective selection criteria and display the observed transaction-by-transaction enterprise values, pricing multiples and financial metrics and also fails to disclose whether other multiples and/or transaction premiums were examined, and if so, to disclose them. The Recommendation Statement does not show any market data observed by Wells Fargo;

- As to *Selected Transactions*, fails to explain why one-year-back and one-year-forward EBITDA multiples were used for TV companies, whereas LTM EBITDA multiples were used for radio companies;

- As to *Selected Transactions*, fails to explain why EBITDAP multiples were not examined for precedent transactions;

- As to *Selected Transactions*, fails to distinguish transactions for which Kagan and/or other database data was used from those from which news articles were used. The Recommendation Statement also fails to explain the procedure Wells Fargo followed when both sources were available. This is one of the reasons transaction-by-transaction pricing multiples and financial metrics are important to shareholders. Kagan is a very expensive database and thus not available to the vast majority of shareholders;

- As to *Discounted Cash Flow Analysis*, fails to identify, quantify and source the WACC assumptions;

- As to *Discounted Cash Flow Analysis*, fails to indicate the basis for the terminal EBITDAP multiples of 9.20x-10.50x, which does not appear to correspond to either the public companies analysis or the precedent transactions analysis;

- As to *Discounted Cash Flow Analysis*, fails to disclose the implied growth rates corresponding to the assumed terminal multiples;

- As to *Discounted Cash Flow Analysis*, Wells Fargo's analysis contains a potentially significant analytical error in that it deducted pension liabilities from enterprise value, rather than from adjusted enterprise value; and

- As to *Discounted Cash Flow Analysis*, fails to explain the fully diluted shares outstanding, given that the indicated value is for a segment and not for the entire company.

59. Wells Fargo's *Newspaper Ownership Analysis* fails to explain why EBITDAP multiples weren't used in the analysis of the Newspaper business segments, as they were in the

Broadcasting business segments. Additionally, specifically as to *Financial Analysis of the Scripps Newspaper Business*, the Recommendation Statement:

- As to *Selected Public Traded Companies Analysis*, fails to disclose the objective selection criteria along with the observed company-by-company pricing multiples and financials metrics examined by Wells Fargo and also fails to discuss whether other multiples were examined, and if so, to disclose them;

- As to *Selected Public Traded Companies Analysis*, fails to explain the fully diluted shares outstanding, given that the indicated value is for a segment and not the entire company;

- As to *Discounted Cash Flow Analysis*, fails to identify, quantify and source the WACC assumptions;

- As to *Discounted Cash Flow Analysis*, fails to disclose the implied growth rates corresponding to the assumed terminal multiples; and

- As to *Discounted Cash Flow Analysis*, fails to explain the fully diluted shares outstanding, given that the indicated value is for a segment and not the entire company.

60. With regard to the *Financial Analysis of the Journal Newspaper Business*, the Recommendation Statement:

- As to *Selected Public Traded Companies Analysis*, fails to disclose the objective selection criteria along with the observed company-by-company pricing multiples and financials metrics examined by Wells Fargo and also fails to discuss whether other multiples were examined, and if so, to disclose them;

- As to *Selected Public Traded Companies Analysis*, fails to explain the fully diluted shares outstanding, given that the indicated value is for a segment and not the entire company;

- As to *Discounted Cash Flow Analysis*, fails to identify, quantify and source the WACC assumptions;

- As to *Discounted Cash Flow Analysis*, fails to disclose the implied growth rates corresponding to the assumed terminal multiples;

- Fails to explain why was no precedent transactions analysis prepared for the Journal Newspaper business;

- As to *Miscellaneous*, fails to specify the fixed and contingent portions, respectively, of Well Fargo's fees; and

- As to *Miscellaneous*, fails to quantify the fees paid to Wells Fargo by Scripps and Journal, respectively, for the services detailed on this page.

61.    The foregoing information is vital in order for shareholders to cast a fully and adequately informed decision on whether to tender their shares.  In the absence of such material information, shareholders are left wondering as to the true merits of the Proposed Transaction.

62.    Unless enjoined by this Court, Defendants will continue to be in violation of the federal securities law, and continue to act to the detriment of the Company and its public stockholders.  Plaintiffs have no adequate remedy at law.  Accordingly, Plaintiff seeks equitable relief to prevent the irreparable injury that Company stockholders will suffer absent judicial intervention.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS, JOURNAL AND SCRIPPS FOR VIOLATION OF SECTION 14(a) OF THE 1934 ACT AND RULE 14A-9 PROMULGATED THEREUNDER

63.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

64.     Plaintiff repeats all previous allegations as if set forth in full herein.

65.     The Individual Defendants have caused Journal to prepare and file the Recommendation Statement with the SEC with the intention of soliciting shareholder support of the Proposed Transaction.

66.     Defendants disseminated the false and misleading Recommendation Statement specified above, which failed to disclose the material facts and information necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

67.     The Recommendation Statement was prepared, reviewed and/or disseminated by Defendants.  It misrepresented and/or omitted material facts, including material information about the unfair sales process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets as a stand-alone entity and as a merger partner for Scripps.

68.     In so doing, Defendants made untrue statements of material facts and/or omitted to state material facts necessary to make the statements that were made not misleading in violation of § 14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.  By virtue of their positions within the Company, Defendants were aware of this information and were aware of their duty to disclose this information in the Recommendation Statement.

69.     Defendants were at least negligent in filing the Recommendation Statement with these materially false and misleading statements.  The omissions and false and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Recommendation Statement.

70.     By reason of the foregoing, Defendants have violated § 14(a) of the 1934 Act and SEC Rule 14a-9(a) promulgated thereunder.

71.     Because of the false and misleading statements in the Recommendation Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate, and Plaintiff and other members of the Class have no adequate remedy at law.  Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

### COUNT II

### <u>AGAINST THE INDIVIDUAL DEFENDANTS FOR VIOLATION OF<br>§ 20(a) OF THE 1934 ACT</u>

72.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

73.     The Individual Defendants acted as controlling persons of Journal within the meaning of § 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Journal, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contend are false and misleading.

31

74.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

75.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the Proposed Transaction giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of this document.

76.     In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Proposed Transaction.  The Recommendation Statement purports to describe the various issues and information that they reviewed and considered and which had input from the Board.

77.     Moreover, the Individual Defendants each have the duty individually to discover and correct any material misstatement or omission of material fact, which they have failed to do.  By virtue of the foregoing, the Individual Defendants have violated § 20(a) of the 1934 Act.

78.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to § 20(a) of the 1934 Act.  As a direct and proximate result

of the Individual Defendants' conduct, Plaintiffs will be irreparably harmed, and Plaintiff and other members of the Class have no adequate remedy at law.

## COUNT III

**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**

79.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

80.     By the acts, transactions, and courses of conduct alleged herein, the Individual Defendants have violated their fiduciary duties of good faith, loyalty, and due care at the expense of Plaintiff and other members of the Class.

81.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and will further a process that inhibits the maximization of stockholder value.

82.     In light of the foregoing, the Individual Defendants and the Company must, as their fiduciary obligations require that the Individual Defendants, among other things, disclose all material facts and information necessary to permit the Company's public stockholders to make an informed decision with respect to the Proposed Transaction or any alternate transaction.

83.     Absent injunctive relief, Plaintiff and the Class will continue to suffer irreparable harm as result of the Individual Defendants' breaches of fiduciary duty, for which Plaintiff and the Class have no adequate remedy at law.

## COUNT IV

**AGAINST SCRIPPS MEDIA INC., DESK SPINCO INC., SCRIPPS NP OPERATING, LLC, DESK BC MERGER LLC, BOAT SPINCO INC., JOURNAL MEDIA GROUP, DESK NP MERGER CO, BOAT NP MERGER CO., AND E.W. SCRIPPS FOR AIDING AND ABETTING THE INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTY**

84.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

33

85. Defendants Scripps Media Inc., Desk Spinco Inc., Scripps NP Operating, LLC, Desk BC Merger LLC, Boat Spinco Inc., JMG, Desk NP Merger Co, Boat NP Merger Co., and E.W. Scripps have aided and abetted the Individual Defendants in the aforesaid breaches of their fiduciary duties.

86. Such breaches of fiduciary duties could not and would not have occurred but for the conduct of Scripps Media Inc., Desk Spinco Inc., Scripps NP Operating, LLC, Desk BC Merger LLC, Boat Spinco Inc., JMG, Desk NP Merger Co, Boat NP Merger Co., and E.W. Scripps, which, therefore, have aided and abetted such breaches in connection with the Proposed Transaction.

87. As a result of the unlawful actions of Scripps Media Inc., Desk Spinco Inc., Scripps NP Operating, LLC, Desk BC Merger LLC, Boat Spinco Inc., JMG, Desk NP Merger Co, Boat NP Merger Co., and E.W. Scripps, Plaintiff and the other members of the Class will be irreparably harmed unless their actions are enjoined by the Court.

88. Desk BC Merger LLC, Boat Spinco Inc., JMG, Desk NP Merger Co, Boat NP Merger Co,, and E.W. Scripps will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties owed to Plaintiff and the members of the Class.

89. Plaintiff and other members of the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff and members of the Class demand judgment against Defendants as follows:

A.      declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying the Class as defined herein;

B.      enjoining, preliminarily and permanently, the Proposed Transaction;

C.      enjoining Defendants, their agents, counsel, employees and all person acting in concert with them from consummating the Proposed Transaction unless and until the Company adopts and implements a fair sales process that includes amending the Proxy so that it no longer omits material information concerning, among other things, the Proposed Transaction;

D.      in the event that the Proposed Transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.      directing that Defendants account to Plaintiff and the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their violation of the federal securities laws and their common law fiduciary duties;

F.      awarding Plaintiff and the Class the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's and the Class's attorneys and experts; and

G.      granting Plaintiff and the Class such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

[SIGNATURE BLOCK ON FOLLOWING PAGE]

35

Dated this 6th day of January, 2015.

HANSEN REYNOLDS DICKINSON CRUEGER LLC


By: _s/Charles J. Crueger_____
Charles J. Crueger, SBN: 1029825
ccrueger@hrdclaw.com
Erin K. Dickinson, SBN: 1036707
edickinson@hrdclaw.com
316 N. Milwaukee St., Suite 200
Milwaukee, WI 53202
Telephone: 414-273-8474
Facsimile: 414-273-8476

*Attorneys for Plaintiff Howard Goldfinger and Proposed Class*

**OF COUNSEL:**

**MILBERG LLP**
Kent A. Bronson
kbronson@milberg.com
Christopher Schuyler
cschuyler@milberg.com
One Pennsylvania Plaza
New York, NY 10119
Telephone: 212-594-5300
Facsimile: 212-868-1229

*Attorneys for Plaintiff Howard Goldfinger and Proposed Class*